Delauriere vs Emmerson.

FREMON DELAURIERE vs. THOMAS EMMERSON.

1. A title derived from a location of land covered by the Spanish claim, confirmed by act of congress, made by the state of Missouri, by virtue of the act of March 6, 1820, is superior to a title derived from a confirmation under the act of congress of July 4, 1836.

2. The second section of the latter act, protects all actual locations, and sales *bona fide* made under color of the law of the United States. (Sarpy vs. Papin, 7 Mo. Rep., 503, and Allison vs. Hunter, 9 ib., 762.)

ERROR to Ralls Circuit Court.

WELLS, for plaintiff in error.

The plaintiff's title is a grant from the Spanish government for 10,000 arpents confirmed by the act of 4th July, 1836, to Charles Fremon Delauriere and Lewis Labeaume. There is no question but that the plaintiff has all the title of the grantee.

The claim was duly presented to the recorder of land titles, prior to 1st July, 1808, and was therefore within the provisions of the act of congress reserving Spanish grants from sale.

The defendant claims by purchase from the State of Missouri, in 1831. The claim of the State is founded on the section of the act of congress of the 6th of March, 1820, which granted to the State twelve salt springs with six sections of land contiguous to each.

The plaintiff in error insists that the defendant's title is defective in the following particulars:

1st. The act of 6th of March, 1820; under which the claim of the State arises, provided, that the legislature of the. State should select the salt springs and lands granted, on or before the 1st day of January, 1825. This selection was not made by the State until January 14th, 1825, and consequently the power in the legislature to select had ceased.

2nd. The act of March 6th, 1820, provided, that the legislature should select no lands which had been or might thereafter be confirmed or adjudged to any individual.

Delauriere vs. Emmerson.

This land had been regularly surveyed and reserved from sale as the claim of Delauriere, and has since been confirmed. If the proviso had any effect whatever, it must apply to such cases as this.

The defendant also, claims, that although the original selection of this land by the State was illegal, yet that any defect in the original grant to the State is cured by the act of congress of 3d of March 1831.

The act of the 6th of March, 1820, provides, that the State shall not sell or lease the land thereby granted for more than ten years.

The act of the legislature of Missouri of ———— asked congress to take off this restriction, and congress, by the act of 3d of March, 1831, removed the restriction and authorized the State to sell in fee simple.

This act gave no additional title to the State. The act of 1820, granted the land to the State in fee simple. There was nothing left in the government to grant. The grant was complied with conditions—1st. That the State should select before the 1st January, 1825. 2nd That private claims should not be selected. Both these conditions have been violated by the State.

FREMON & REBER, for plaintiff.

The counsel for the plaintiff contend that the court erred in refusing to give the first instruction asked by the plaintiff.

The grant to Delauriere and Labeaume is bona fide and for a valuable consideration expressed on the face of the grant. On account of the remoteness of the country from any sea port, and the difficulties of navigation at that time, the manufacture of salt was an object of the highest importance to the government. This was the consideration. Shortly after the grant, Delauriere, one of the grantees, moved his family upon the land, made large quantities of salt and remained there for several years, and until after the change of government, when the Indians drove him off and he was ruined by the undertaking.

The land was conveyed in proper time. See certificate of Soulard. In obedience to the act of 3d of March, 1807, the claimants filed their grant, survey, title, papers, &c., with the recorder of land titles on the 30th of June, 1808. Hence the bar of that statute never operated against them.

By the third article of the treaty concluded the 30th of April, 1803, between the United States and the republic of France, the United States were bound to maintain and protect the citizens of Louisiana in the free enjoyment of their property, &c. The second article of the treaty declares that in this cession are included all public lots, vacant lands, &c., which are not private property.

The right of property is then protected and secured by the treaty, and no principle is better settled in this country than that an inchoate title to land is property. Chief Justice Marshall's opinion in Derlasses vs. United States, 9 Peter Rep., 130.

The language of the treaty excludes every idea of interfering with private property, of transfering land which had been severed from the Royal domains. Ibid, also 12 Peter's Rep. 410.

"Treaties are the law of the land and a rule of decision in all courts." 2 Peters, 314; 9 Peters, 113; also Smith vs. United States, 10 Peters, 330. Hence on the 6th of March, 1820, when the act under which the defendant claims, was passed, the land in controversy was private property, detached from the public lands and equally entitled to the protection of the government, as the land of any other person honestly acquired. Therefore the State could not under said act of March 6th, 1820, lawfully select said land.

But further by the act of congress of the 3rd of March, 1811, and the 17th of February, 1818, said land was reserved from sale until the final decision of congress thereon.

Delauriere vs. Emmerson.

When the act of the 6th of March, 1820, was passed, the act of the 17th of February, 1818, was still in force. Both of these acts can operate without encroaching upon each other. For whoever knows any thing of the geography of the State of Missouri at that time, knows that there were many more than twelve salines unencumbered with French or Spanish claims within the State, upon which the act of 6th of March, 1820, could have operated. Hence the former act is not repealed by the latter, and courts must construe them together, as if they formed but one act. This principle is fully decided in the case of the United States vs. Gear 3d, Howard's Rep., 131. The court there says:—

"The rule is that a perpetual statute which all statutes are, unless limited to a particular time,) until repealed by an act professing to repeal it, or by a clause or section of another act bearing in terms upon the particular matter of the first act, notwithstanding an implication to the contrary may be raised by a general law which embraces the subject matter, is considered to be still the law in force as to the particulars of the subject matter legislated upon. Thus in this case, all lands within the district, means all lands in which there are, and in which there are not minerals or lead mrnes; but a power to sell all lands given in a law subsequent to another law expressly reserving lead mine lands from sale, cannot be said to be a power to sell the reserved lands, when they are not named, or to repeal the reservation. In this case there are two acts before us, in no way connected, except in both being parts of the public land system. Both can be acted upon without the interference of the provisions of the last with those of the first, each performing its distinct functions within the sphere as congress intended they should do." In 6 Porter's Ala. Rep. page 231, the court say, "The law never favors the repeal of a statute by implication, unless the repugnance be quite apparent, and such repeal carrying with it a reflection on the wisdom of former legislatures, it has ever been confined to the repealing as little as possible of precedent statutes; and though two statutes be seemingly repugnant, yet if there be no clause of non obstante in the latter, it shall if possible have such construction that the latter may not be a repeal of the former by implication."

The court in this case will perceive that the act of the 6th March, 1820, not only does not profess to repeal the act of 17th of February, 1818, but it expressly incorporates into it the same reservations, by prohibiting the legislature of the State of Missouri from selecting any salt spring which was then, or should thereafter be. confirmed or adjudged to any individual or individuals; and whoever has read the acts of Congress on the subject of the public lands, cannot but have perceived a scrupulous anxiety on the part of congress to protect individuals in their claims to land honestly acquired under the French and Spanish governments.

In short the act of 17th Februaay, 1818, reserved the land in controversy in this suit until after the final decision of Congress thereon. The act of 6th March, 1820, not only does not repeal the act of 1818, but expressly incorporates into it the same reservation. Both acts can operate without the provisions of the latter interfering with those of the former. They must be construed as one act. But the land in controversy has been confirmed to Delauriere and Labeaume by the act of Congress of the 4th of July, 1836. Therefore the legislature of Missouri could not under the provisions of the act of the 6th of March, 1820, lawfully select said land. Its selection was without authority, against law, and therefore void. It was therefore not protected by the act of 4th July, 1836.

The court erred in refusing to grant the second instruction asked by the plaintiff.

The proviso in the act of the 6th March, 1820, is in these words: "Provided no salt spring, the right whereof now is or hereafter shall be confirmed, or adjudged to any individual or individuals, shall by this section be granted to said State."

"A law is the best exposition of itself." 2 Cranch. 33. "If circumstances might exist under which every word of this act can have an effectual operation, then it is certain that there is nothing doubtful or obscure in its terms, &c." 9 Porter's Alabama Rep. 268.

The intention of Congress is plainly and positively expressed and must prevail. Ibid.

The court erred in refusing to grant the third instruction asked by the plaintiff. The act of 6th of March, 1820, provides that the salines shall be selected by the legislature of the State

Delauriere vs. Emmerson.

of Missouri on or before the 1st of January, 1825. The legislature of the State of Missouri consists of a senate and house of representatives. See Constitution of Missouri. The legislature then did not select the land in controversy until the 14th of January, 1825. See the act selecting the salines. Digest of 1825.

The report of the commissioners was no selection until approved by the legislature. There is no evidence that report was before the house of representatives before the 14th January, 1825. Nor is there any evidence of the appointment of commissioners at all. The secretary of the treasury had no power to confirm the selections. That power was in Congress alone. But even if he had, his approval was too late. He approved in August, 1837. Congress by the act of 4th July, 1836, had already passed the title to Delauriere and Labeaume.

The court erred in refusing to give the fourth instruction asked by the plaintiffs. The act of the 3rd of March, 1831, is no grant—it does not profess to be a grant; on the contrary, it admits that the grant had already been made. By the act of 6th of March, 1820, the legislature was prohibited from selling or leasing the salines at any one time for a longer period than ten years without the consent of Congress. Congress, by the act of 1831, consented that the legislature of Missouri should sell the lands absolutely. See Payne vs. St. Louis county, Missouri Reports.

The deed from the State of Missouri to James Emmerson was therefore void. 6 Peters, 666, Lindsey vs. Miller's lessee.

ANDERSON & DRYDEN, for defendant in error.

Emmerson presents the following chain of title, viz:

1st. The second clause of the 6th section of an act of congress, approved March 6th, 1820, entitled an act to authorise the people of Missouri to frame a constitution—provides for the grant of 12 salt springs with 6 sections of land adjoining to each, for the use of the State, to be selected by the legislature on or before the first day of January, 1825—provided that no salt spring, the right whereof is or hereafter shall be confirmed or adjudged to any individual or individuals, shall by this section be granted to the State; and provided also, that the legislature shall never sell or lease the same at any one time for a longer period than 10 years, without the consent of congress. See U. S. land laws, instructions and opinions, part 1st, page 321.

2d. The people of Missouri in convention accepted the aforesaid proposition by an ordinance of 19th July, 1820. See Digest of Missouri Laws, page 40.

3d. On the 14th January, 1825, the legislature of Missouri passed an act selecting the said salt springs and land. Mo. Digest, 1825, page 697.

4th. On the 30th December, 1824, the legislature passed an act providing for the leasing and managing of the State salines, thereby taking possession of the same, and exercising acts for ownership over them. Mo. Digest, page 700.

5th. On the 1st day of January, 1831, the legislature passed an act providing for the sale of the saline lands, so soon as Congress should raise the restriction and assent to the sale of the benefit of the state, &c. 2nd vol. Territorial Laws, page 241.

6th. By the 8th section of an act of Congress, approved March 3d, 1831, entitled "an act to create the office of surveyor of public lands for the State of Louisiana," the legislature of Missouri is authorized to sell and convey in fee simple, the salt springs and six sections of and granted by act of 6th of March, 1820. See 1st Land Laws, p. 491.

7th. The patent from the State of Missouri to Emmerson, dated      day of    , 1831.

LEONARD & BAY, for defendant in error.

The plaintiff claims under the act of Congress of the 4th of July, 1836; the defendant under a patent of this State, founded upon a sale of saline lands, and the question is on the comparative merits of these two titles.

Delauriere vs. Emmerson.

I. The defendants title. The act of 6th of March, 1820; the ordinance of the convention of the 19th of July, 1820, and the selection of the land by the direction of our general assembly constituted in January, 1825, a valid title in the State to the land in controversy, superior to the title of the United States on the 4th of July, 1836, when the plaintiff's title originated, and this title with the consent of Congress, given by the act of the 3d of March, 1831, was in the same year vested in the defendant by the patent of this State.

The objections to this title are, 1st, that the land was not selected by the 1st of January, 1825, the time prescribed by the act of March, 1820, for making the selections. To the objection the answers are, first, that the selection of the land after the 1st of January, 1825, did not annul the title of the State to the land selected. In this particular the law of the United States was merely directory, and the omission to act within the time limited, while it might prejudice this State, could not work any injury to the United States. Second, the selection was in fact made by the commissioners before the 1st of January, 1825, although the act of the general assembly approving the selection, did not become a law until the 14th of that month, and in support of the grant the court ought to hold the selection to have been made in due time within the meaning of the grant.

2nd objection. The land in controversy is land reserved from sale by the act of Congress of the 3d of March, 1811, and therefore not subject to selection as saline lands. The answer to this objection is, the reservation is a limitation on the executive department of the government, and is not and cannot be a limitation upon the power of Congress over these lands. If the United States could not grant it to this State, and of course there was no necessity to insist upon a limitation of that character in the grant. But the legislative reservation of these lands from executive disposition did not convert them into private property, and although reserved from sale, they were public lands in 1820, and subject to the disposition of Congress.

3d objection. By the terms of the act of 6th of March, 1820, salt springs confirmed, or which might thereafter be confirmed, are exempted from selection as saline lands, and the land having been subsequently confirmed by the act of July, 1836, the previous location has by this subsequent confirmation become void. To this objection we answer: 1st. The limitation upon the range of selection contained in the grant is confined to "salt springs" confirmed, or that may thereafter be confirmed, and does not embrace the adjoining land. 2nd. Although the United States might have confirmed the land now in controversy, and thereby have defeated the defeasible estate which this State acquired by the selection, the act of July, 1836, does not exercise this power—that act is not an absolute confirmation. The claims are confirmed *sub modo* only so far as they do not come in conflict with previous locations or sales. 3d. The act of Congress of the 3d of March, 1831, conferring upon the State the power of alienation is a confirmation of the selections made under the original grant, and if these selections were originally irregular or even void on account of their conflicting with a Spanish concession, or for want of being selected in proper time; this act cured the defect and vested a valid title in the State, before the origin of the plaintiff's title.

II. The plaintiffs title. This is derived exclusively from the act of July, 1836; it had its commencement then and derives its whole origin from that source. When that act was passed, all claim upon the government of the United States for a confirmation of the alleged Spanish concession expressly extinguished by the laws of the United States on account of the omission of the claimant to present his claim for adjudication to the district court under the act of 1824. Although by the first section of the act the claim is confirmed, by the second section that confirmation is confined to land not embraced by a location or sale made under the laws of the U. S., and in lieu of the land so disposed of, equivalent lands are granted to the confirmed elsewhere. The is question here is, whether the location made by the State under the act of March, 1820, although defective and irregular, is yet a location within the provision of the 2nd section of the act. This section, it is admitted does not refer to valid locations and sales. They were able to protect themselves, and stood in no need of the aid of this section ; neither does it refer to locations and sales that are absolutely void—mere nullities as to the whole world. The case of Stoddard vs. Chambers in which this question was before

---

Delauriere vs. Emmerson.

---

the supreme court of the United States is not identical with the present case. There the question was, whether a New Madrid location upon reserved land was within the protection of the 2nd section of the act. Here the question is, whether the selection of the land in controversy by the State as saline land is void by reason of the subsequent confirmation. In the former case the authority to locate was confined to land, "the sale of which is authorized by law." Here the authority is general, without any limitation except of salt springs confirmed thereafter. In the former case there was no authority to make the location upon the land selected· Here the question is not whether the selection was void at the time it was made, for then it could not be determined whether the land would ever thereafter be confirmed, or not ; but whether the confirmation relied upon is such a confirmation of the land covered by the selection of the state, as will defend the location. In Stoddard vs. Chambers the location was void from beginning. Here it is voidable by a subsequent confirmation, and the question is, whether there has been any such confirmation.

NAPTON, J., delivered the opinion of the court.

The record of this case presents a single question, involving the relative value of a title derived from a confirmation under the act of Congress of July 4, 1836, and one derived from a location of the land covered by the Spanish claim, confirmed by that act, made by the state of Missouri, by virtue of the act of March 6, 1820.

By the act of March 6, 1820, there were granted to the state of Missouri twelve salt springs, with six sections of land adjoining to each, to be selected by the state within a specified time, with this proviso : "that no salt springs, the right whereof now is, or hereafter shall be, confirmed or adjudged to any individual or individuals, shall by this section, be granted to said State."

The claim of Delauriere for 10,000 arpents of land was located upon the land now in controversy, and the same land was selected by the State in 1825, as saline land under the act of 1820. Delauriere's claim was duly surveyed before the change of government, and duly filed with the recorder, and was consequently within the reservation of the acts of 1811, 1818, &c. The defendant claimed under a sale of the State of Missouri.

The claim of Delauriere was confirmed by the act of July 4, 1836. The second section of that act provided, "that if it shall be found that any tract or tracts, confirmed as aforesaid, or any part thereof, had been previously located by any other person or persons, under any law of the United States, or had been surveyed and sold by the United States, this act shall confer no title to such lands in opposition to the rights acquired by such location or purchase."

Upon the construction of this section depend the rights of the parties in this case, and to a proper understanding of its import and intent, we must revert to the origin and occasion of the enactment.

In 1832 (July 9) Congress passed a law establishing a board of com-

missioners, with power to examine and report upon "all the unconfirmed claims to land in Missouri, heretofore filed in the office of the recorder according to law." All these claims had been before a previous board of commissioners, from 1806 up to 1812; many of them before the recorder who succeeded to the powers and duties of this board—and some of them subsequently presented to the district judge of the United States, who acted under the act of 1824. They were all within the reservation of the act of 1811, and continued to be so until the 26th May, 1830, when the last act authorizing their submission and confirmation had expired.

This was the condition of these claims when the commissioners under the act of 1832 met. The claims were of nearly thirty years standing against the government of the United States—had been rejected in 1812 as destitute of merit, and had failed to meet with favor at the hands of any of the subsequent tribunals which Congress had appointed for their adjustment. All the laws reserving them from sale had expired, and the government could have sold or given away every foot of land embraced within their limits, at the time the act was passed appointing this last board of commissioners.

Under these circumstances it will not seem strange that many of these tracts of land, lying as they generally did in the oldest and earliest settlements, should be occupied by persons under titles conflicting with that of the Spanish claimant. Such was the fact, and a fact well known to the commissioners. Pre-emption rights, locations of New Madrid certificates, locations by the State, entries at the land offices, had all been permitted under the connivance or through the carelessness of government officers, and all of them professing to derive title from the United States, and made under color of her laws.

The board of commissioners determined to confirm, and did confirm all the claims submitted to them. More than three hundred claims, embracing extensive tracts of the most fertile lands in the most desirable localities, covered as they were with conflicting titles emanating from the same power which was to pass upon the claims, and rejected for thirty years as destitute of merit, were thus recommended for confirmation. We are far from supposing that this recommendation was unwise. On the contrary, it was designed to do justice to all parties and was no doubt the best plan to relieve the government at a small expense of the still greater losses of time and money, which were certain to ensue from their rejection.

But the commissioners did not simply recommend a confirmation of the claim. They were apprised of the injustice which such a sweeping

enactment would produce. . The following passage in their report is sufficient to show their views.

"Upon the subject of conflicting claims, we have been unable to ascertain to what extent they exist. We are of opinion, hower, that they exist to a considerable degree. There are numerous cases of lands lying within these French and Spanish claims, belonging to individuals whose right or claim originated under the government of the United States; some depend upon purchases, some upon the law allowing pre-emptions; some others upon New Madrid locations, and some again upon settlement rights which have been confirmed. Most of these persons have been for a long time settled upon their lands. Their claims being of a *bona fide* character, derived from the government of the United States, they went on to improve their lands, making for themselves and families comfortable homes, without any belief that they ever would be interrupted in their possessions. Should these cases reported by the board be confirmed by Congress in whole or in part, Congress will in their wisdom, no doubt, notice the suggestion here made, and carve out such a course as will quiet the uneasiness and anxiety which are felt by doing everything which the most scrupulous of justice could require."

Congress did notice this suggestion, as we think and provided in the second section of the act, for the security of these occupants. They declared that "if it should be found, that any tract or tracts confirmed as aforesaid, or any part thereof, had been previously located by any person or persons, under any law of the United States, or had been surveyed and sold by the U. S., this act should confer no title to such land in opposition to the rights acquired by such location or purchase."

We understand this section to protect *all actual locations and sales bona fide* made under color of the law of the United States.

By this construction justice is done to all parties concerned. The "uneasiness and anxiety" of the conflicting claimants, alluded to by the commissioners is quieted by the assurance that they will not be driven from their firesides, and the confirmees of the Spanish title get a full equivalent in the choice of equal portions of the public domain, quite as valuable as their own selections were when they were first made.

But it has been said that these sales and locations must have been made *in conformity to law,* and that the words of the section "under any law of the United States," means "*in conformity to* or *in accordance* with" the laws of the United States. This may be so, but if it is, the section is a complete nullity, so far as locations are concerned, and but little better, in respect to sales at the land office, and the benevolent designs of Congress are frustrated by a rhetorical blunder.

I have heretofore observed that all the claims upon which this board of commissioners acted, were such as had been filed with the recorder, and consequently reserved from sale. No locations could be made upon these lands nor could any sale of them be made according to the laws of the United States, until the 26th May, 1830. Before this period all the New Madrid locations had been made. The act was passed in 1815, and it is hardly probable that a single certificate holder omitted to locate his claim until so late a period as 1830. The construction, then, to which I have alluded, sweeps away all this class of claims : New Madrid locations are worthless when in conflict with a confirmation under this act. So the locations made by the State under the act of 1820, March 6, were all made before 1830. What becomes then of that part of the act which says that any tract or parts of a tract which has been previously located, under any law of the United States, shall not pass by the confirmation ? So of entries at the land office. A few of these have no doubt been made subsequently to 1830 ; but numbers of these were made before. Upon the Du Breuil claim in Pike county, there are 4S entries made from 1818 up to 1846. (Allison vs. Hunter, 9 Mo Rep. 765.)

Thus much I have thought proper to say in vindication of the opinion heretofore advanced by this court upon the proper construction of the act of 1836. (Sarpy vs. Papin, 7 Mo. R. 503 ; Allison vs. Hunter, 9 ib. 762.) I will now add that the supreme court of the United States have taken a different view of the subject, so far as New Madrid locations are concerned. They have determined these locations to be nullities, and therefore not protected by the second section of this law. In a late case (Maxwell and others vs. Massey) they have also intimated, perhaps decided, that sales by the register and receiver are protected by the act. The present case is not within the letter of either of these decisions. I do not pretend that there is any difference in my judgment between a location by the State and a location by the holder of a New Madrid certificate. Nor have I been able to perceive any distinction between a New Madrid location and an entry at the land office. They are all different forms of transferring the public domain— all of them when made upon reserved land prohibited by the law—all of them, however, brought about through the agency of officers of the federal government, and under color of law. So far as the supreme court of the United States, the ultimate arbiter in questions of this character, have gone, we are content to follow, but having withdrawn sales from the operation of the act of 1836, in Stoddard vs. Chambers, it is not for us to conjecture to which class of cases they will assimilate

the present—whether to the locations under the act of 1815, or the sales at the land offices. Under the circumstances, we think it best to stand by our previous opinions.

Let the judgment be affirmed.